14 N.J. Super. 401 (1951)
82 A.2d 425
EDWARD DEVONE, PLAINTIFF-APPELLANT,
v.
NEWARK TIDEWATER TERMINAL, INC., DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued April 30, 1951.
Decided June 28, 1951.
*402 Before Judges EASTWOOD, BIGELOW and SCHETTINO.
*403 Mr. Abraham I. Mayer argued the cause for the appellant (Messrs. Mayer and Mayer, attorneys).
Mr. Raymond L. Cunneen argued the cause for the respondent.
The opinion of the court was delivered by BIGELOW, J.A.D.
This is an appeal from a judgment in favor of defendant, Newark Tidewater Terminal, Inc., entered on a jury's verdict.
The principal questions on appeal are whether the trial court erred in its handling of the issue of respondeat superior, and in submitting the issue of contributory negligence to the jury.
Plaintiff was employed by Dade Brothers. Newark Tidewater furnished a dinkey engine and crew to Dade for the purpose of moving freight cars for Dade on Dade's property. Plaintiff was injured by the alleged negligence of the engineer of the dinkey engine. The engineer was one of the crew furnished by Newark Tidewater. Newark Tidewater contended that at the time of the accident, the engineer was under the control of Dade and hence was acting as Dade's employee and not as employee of Newark Terminal.
The testimony was to the following effect: Dade's employees told the engineer "what to do and where to get the cars and where to put them." The members of the crew reported to Dade's employee who "gave us orders what to do and the switching around." It appears that Newark Tidewater received calls from Dade "four or five times a week to move cars around for them" at a charge of five dollars per car moved; that on the day in question, a Saturday, the charge was a flat rate for the day, "no matter if they moved one car or fifty." Both rates were a single rate for the use of the dinkey and for the services of the crew. There was no evidence that Dade exercised any control over the operation of the dinkey crew beyond indicating what cars were to be moved and the places to which they were to be moved.
*404 In this posture of the proof, plaintiff requested the court to instruct the jury as follows:
"1. In order to determine whose servant or agent the operator of the engine was, you may consider the following factors: a. Who owned the engine? b. Who maintained the engine? c. Who paid the salary to the engineer? d. Who had the power to hire or fire him? e. Whether the engineer expressly or impliedly agreed to have his employment transferred from that of employee of Newark Tidewater Terminal, Inc., to that of Dade Brothers.
2. Under the facts testified to in this case, the engineer was the agent and servant of the defendant Newark Tidewater Terminal, Inc., and if you find that the engineer who operated the engine was negligent, then you should bring in a verdict in favor of plaintiff."
The trial court refused both requests.
The court left to the jury the issue whether the engineer of the dinkey engine on the day in question was the servant of the Newark Tidewater or the servant of Dade, and charged that:
"The question of whether the general employer is master turns upon the proposition as to who had the right to exercise control over the servant."
Plaintiff excepted to the court's failure to charge as requested, the failure to define "what constitutes control," and the failure to charge that "the mere fact there was general direction given would not of itself show control of the employees."
It is, of course, apparent that the court's charge did not specify the nature of the right of control which was thus made crucial. If the charge was intended to mean that the right of control as to what work was to be accomplished was decisive, the jury necessarily had to find for Newark Tidewater on the issue, because clearly it was Dade who had the right to dictate what cars were to be moved and to where. If the charge referred to the right to control the means by which a specified result was to be accomplished, that is, how the engine should be operated, then the record scarcely furnished a basis for a finding that that right existed in Dade.
*405 It was held in the early days that the negligence of one in the position of Johnson, the engineer, could not be imputed to Dade, but must be imputed to Tidewater Terminal, unless the relation of master and servant had arisen between Johnson and Dade. Laugher v. Pointer, 5 B. & C. 547; 108 Eng. Repr. 204 (K.B. 1826); New York L.E. & W.R.R. Co. v. Steinbrenner, 47 N.J.L. 161 (E. & A. 1885). To solve the issue of liability, inquiries were made that would be pertinent if the alleged change of employment was permanent: Who paid the wages? Who had the right to discharge the servant? Did the servant consent to the change of masters? This was approximately the position taken by Justice Minturn, and the majority of the court, in Courtinard v. Gray Burial, etc., Co., 98 N.J.L. 493 (E. & A. 1923). But Judge White, concurring in the result, put aside such questions and expressed the opinion that it is the control or right to control which fixes the liability. The terms "general employer" and "special employer" have come into use, but it will be observed the special employer is not really an employer in the ordinary sense. Rather, he is one who temporarily controls the activities of another man's servant. Busch v. Seaboard By-Product Coke Co., 100 N.J.L. 304 (E. & A. 1924), advances toward Judge White's position so far as to hold that the important test is that of control of the servant's actions. This test becomes not merely the important one, but decisive in Lacombe v. Cudahy Packing Co., 103 N.J.L. 651 (E. & A. 1927), and Errickson v. F.W. Schwiers, Jr., Co., 108 N.J.L. 481 (E. & A. 1932). These two cases further establish that the control which is meant is ordering not only what shall be done but how it shall be done. We are satisfied that this is the law of New Jersey.
We find no error in the court's refusal to charge as requested. The first request proposes tests for determining whether or not the general employer, that is, the defendant, was responsible for any negligence of the engineer, but the tests proposed are not in harmony with our law as we understand it. The second request was properly rejected because *406 the request, if charged, would have taken from the jury the question of contributory negligence.
But when appellant called attention to the court's failure to charge what constitutes control, the court should have amplified this part of the instructions, for the jury may well have misunderstood what was meant when the court said. "The question of whether the general employer or the specific employer is master turns upon the proposition as to who had the right to exercise control over the servant." We think the court erred in not informing the jury that defendant was answerable for any negligence of the engineer, unless it appeared from the evidence that Dade Brothers controlled, or had the right to control, the manner in which the engineer ran the engine, even though Dade Brothers directed the engineer what cars to move and where to move them.
Judgment reversed.
SCHETTINO, J.S.C. (concurring).
I agree that the judgment should be reversed but I am unable to concur in the test for the determination of responsibility of Newark Tidewater laid down in the majority opinion.
The majority opinion concludes that Newark Tidewater's liability hinges upon the situs of the right of control as to how the engineer's work was to be done. Although that right of control figures prominently in the opinions of the Court of Errors and Appeals, I cannot agree that they consistently embraced that criterion. On the contrary, I find diversity of views expressed therein and believe that the latest decision of that court cited herein points in the direction of the test which I believe to be the one required by basic principle.
That the engine crew were employees of Newark Tidewater prior to the operation here involved and went to Dade's property pursuant to their employer's direction is not disputed. The case accordingly presents the apparently interminable question, when does an employee of a "general employer" become the employee of a "special employer?" For convenience in discussing this problem I will use the *407 terms "general employer" and "special employer" to identify respectively parties situated as are Newark Tidewater and Dade in this case.
The thoughts in this field are many and hardly reconcilable. Prominent is the claim that the crucial consideration is the right to control the employee as to the manner in which the work is done, as distinguished from the result to be accomplished. Frequently, it is stated that the employment is not transferred unless the employee consents, expressly or impliedly, to the transfer. This factor can easily run counter to the first mentioned one. Still further, it is suggested that the test is whether the employee is still furthering the general employer's interests. Another suggestion is that the more rational inquiry would be whether the act of the borrowed servant was within the normal scope of the business of the borrowing employer. These views, and the variety of results reached thereunder will be found in McFarland v. Dixie Machinery & Equipment Co., 348 Mo. 341, 153 S.W.2d 67 (Sup. Ct. 1941); Terminal Railroad Association of St. Louis v. Fitzjohn, 165 F.2d 473 (C.C.A. 8th, 1948); Standard Oil Co. v. Anderson, 212 U.S. 215 (1909); Ramsey v. New York Central Railroad Company, 269 N.Y. 219, 199 N.E. 65 (Ct. of App. 1935); Braxton v. Mendelsohn 233 N.Y. 122, 135 N.E. 198 (Ct. of App. 1922); Charles v. Barrett, 233 N.Y. 127, 135 N.E. 199 (Ct. of App. 1922). 35 Am. Jur., Master and Servant, sec. 541, p. 970-1; 1 A.L.R.2d 302; 136 A.L.R. 525; 102 A.L.R. 514. Section 227 of the Restatement of the Law of Agency, in comment (a) would make the result depend in general upon a number of factors including those stated in section 220 (2), which relate to the determination whether one is an employee or an independent contractor. Section 220 (2) lists nine factual elements "among others."
An examination of our own cases reveals substantially the same conflict of approach. In Courtinard v. Gray Burial and Cremation Co., 98 N.J.L. 493 (E. & A. 1923), defendants, Caseys, undertakers, hired an automobile and driver from *408 defendant, Gray, also an undertaker, for use in connection with a funeral conducted by the Caseys. One of the Caseys rode with the driver, giving directions only as to the cemetery objective. Plaintiff was struck by the car, and sued Gray and the Caseys.
The trial court granted a nonsuit for Gray. The jury found against the Caseys, but the judgment was reversed. The majority opinion stated that the relation of master and servant involves "fundamentally the fact of control, direction and representation in the service at hand"; and referred to the right to select, hire and discharge (p. 495). It added that the transfer of an employee's services could not be accomplished unless "he has assented expressly or impliedly to such transfer" (p. 497). The concurring judge thought that the employee's assent had nothing to do with the issue of liability to third persons, and that "It is the control or right to control which fixes the liability" (p. 498). The dissenting opinion agreed that the transfer of an employee could not be accomplished without his consent, express or implied (p. 500), but urged that Gray was not an independent contractor who had agreed to do the work, that is, bury the deceased, but merely had lent a facility to the Caseys to be used by them in furthering their own business, and that the employee's consent to transfer could readily be inferred, and this despite the fact that the Caseys at no time had occasion to exercise a master's right of control. "The sole test of liability is not whether they gave orders or directions to the drivers, but whether they assumed and had control and management of the funeral" (p. 503).
In Busch v. Seaboard By-Product Coke Co., 100 N.J.L. 304 (E. & A. 1924), it appeared that one Cullum, using his own truck and employees, made deliveries of defendant's product at a fixed charge. Defendant informed the drivers as to the place of delivery, and perhaps also as to whether the load should, at its destination, be shot through a chute or carried in. A directed verdict for defendant was affirmed in an opinion which stated that "The important test, as *409 stated in the Courtinard case, is that of control of the servant's actions" (p. 306).
In Lacombe v. Cudahy Packing Co., 103 N.J.L. 651 (E. & A. 1927) the situation was in essence the same one presented in the Courtinard case and was held to be controlled by it. Although the court said (at p. 654) that "The controlling question is, Who was in control and operation of the vehicle at the time the accident occurred?," yet the court quoted from the Courtinard case to the effect that (p. 653) "the `elements of hiring, control, direction and power of dismissal are made distinct ratio decidendi and present the fundamental tests of liability of the occupant and hirer of the coach under the legal status test of master and servant.'"
In Errickson v. F.W. Schwiers, Jr., Co., 108 N.J.L. 481 (E. & A. 1932), defendant furnished to Hill company a derrick and operator, at a fixed rate per hour as and when used, for the moving of lumber of the Hill Company. Hill's employees determined the size of each load, prepared, wrapped and fastened the lumber, determined the security of the wrapping and fastening, and indicated when the load was to be moved and where it was to be placed. Plaintiff, an employee of Hill, charged that he was injured by the negligence of the operator of the derrick. A nonsuit was granted on the thesis that the derrick and its operator were at the time in the employ and under the control of Hill. In affirming, the Court of Errors and Appeals stated that "The relation of master and servant exists whenever the employer retains the right to direct the manner in which the business shall be done, as well as the result to be accomplished, or in other words, not only what shall be done, but how it shall be done" (p. 483) and held that therefore "the ultimate question in this case is, who had control of the operation" (p. 484). The court found that such control was in Hill. No discussion appears as to whether the operator consented to a transfer of his services. And the question of control of "the operation" may well be different from the question whether the operator was under Hill's right of control as to the operation *410 of the derrick itself. The word "operation," as used in that case, may mean the overall activity of the special employer in which the general employer's contribution is a part. A special employer may control the operation in that broad aspect and yet not control the operation of the means (the derrick) furnished by the general employer. Hence, to be informative, "operation" as there used would require definition. The mere giving of signals as to when to operate a derrick or like equipment is not ordinarily regarded as an exercise of control as to how the equipment shall be handled, and this amply appears in the authorities elsewhere which are referred to above.
In Decker v. Ransome Concrete Machinery Co., 118 N.J.L. 173 (E. & A. 1937), defendant had sold a concrete mixer to Franklin Construction Co. under a conditional sales contract. Franklin had no one competent to operate the mixer and, apparently after the sale, called upon defendant for aid. Defendant furnished its employee, Williams, who was to operate the mixer in the road work of Franklin until an employee of Franklin could familiarize himself with it. The opinion of the trial court states that some allowance appears to have been made by Franklin to defendant "for the services of Williams, who consented." Franklin's foreman designated the site of the road work, and told Williams when to set the mixer in motion. Plaintiff, an employee of Franklin, was injured allegedly through Williams' negligence in operating the mixer. A nonsuit was ordered "for the reason that at the time of the accident he (Williams) was under the direction and control of the construction company and consequently a fellow servant of plaintiff" (p. 176). The judgment was affirmed on the trial court's opinion. This case differs from the other New Jersey cases herein discussed, at least in the circumstance that the general employer did not furnish its own equipment. Despite its interest as conditional vendor, it had no immediate right in it in any sense here pertinent.
In Younkers v. Ocean County, 130 N.J.L. 607 (E. & A. 1943), the defendant county owned a scraper or grader which *411 it rented to the Borough of Pine Beach at the rate of two dollars an hour. The county furnished its employee, Burton, to operate the scraper. Burton was paid on an hourly basis by the borough and was carried on the borough's payroll. He continued to receive pay from the county when doing the county's work. While working for the borough, he was not under the supervision of the county's road supervisor but rather was under the supervision of the borough's road foreman who, however, gave directions only as to what work should be done. Burton testified that the arrangements made by the county with the borough were acceptable to him. Plaintiff, an employee of the borough, was injured by Burton's negligence in operating the grader and recovered a judgment against the county. In affirming, the court stated that the issue of the county's liability "turns upon the decision as to who has the right to exercise control over the servant" (p. 608). It referred to the elements of the master-servant relation as "hiring, control, direction and power of dismissal" (p. 608), and added further that a transfer of services could not be accomplished unless the servant assented, expressly or impliedly. After referring to the foregoing factors, the court concluded (p. 609):
"In that operation the County of Ocean had no interest, excepting only the rental that it would receive for the use of the scraper, and the safe return of the rented instrument at the completion of the rental period. The road supervisor for the county expressly stated that he exercised no supervision over Burton on that specific job. This latter statement is corroborative of the testimony of Heatley, road foreman of the borough that he supervised the use of the grader, at least to the extent of indicating what should be done and thereafter left the execution to Burton's judgment. This, coupled with payment of Burton's wages, points toward the essential element of control lying with the borough rather than with the county. On the other hand is the fact that the grader, an eight ton, motor-driven mechanism of considerable value  judged by the rental paid  was the property of the county and the county officials would expect Burton to be mindful of its interests in his handling of the machine. If he proved himself unmindful of the county's interest in the grader, it retained the right and power to prohibit his operation of it, whether at the time the work being done was for the county or for the municipality. Conceivably there might be a clash of interest between *412 the solicitude of the county for a valuable machine and the desire of the borough for gravel to be used on its roads. If such a conflict in interest arose, was Burton so divorced from his general employment by the county that he could jeopardize its property to further the ends of his specific employer? Then, too, the borough concededly had no voice in the selection of Burton. It took whatever operator the county supervisor saw fit to send with the grader. There is no suggestion in the record that the County of Ocean ever surrendered the right to discharge Burton from its general employment. `In the absence of evidence to the contrary, there is an inference that the actor remains in his general employment so long as, by the service rendered another, he is performing the business entrusted to him by the general employer. There is no inference that because the general employer has permitted a division of control, he has surrendered it.' Restatement of the Law of Agency, § 227, comment (b).
Under the circumstances here exhibited we are of the opinion that there were conflicting inferences to be drawn from the evidence and that the action of the trial judge in submitting the case to the jury was correct." (Italics added.)
The result thus reached appears to be incompatible with the result reached in Errickson v. F.W. Schwiers, Jr., Co., supra. These decisions of the Court of Errors and Appeals fail to reveal any fixed basis for resolving the issue here presented. The element of right of control figures largely in these cases, and since it was here selected by the majority as the sole factor, the significance of that factor should first be considered.
It is true that the right of control as to manner of doing work is an attribute of the master-servant relationship. This right of control, however, cannot be the basis of the doctrine of respondeat superior, for if it were, it would excuse the master who was not present at the time of his servant's culpable conduct and therefore could not have controlled it. Indeed, no court, in holding the master responsible for the negligence of his servant, stops to consider whether the master, by the exercise of his right of control, could have avoided the injury. In the final analysis, the reason for the rule of respondeat superior must be some public policy in favor of burdening one who acts through another in pursuit of his own ends with the injuries incidental to his servant's activities. The right of control is simply one of the tests whereby *413 the courts determine whether the relation of master and servant exists; the liability attaching to that relation arises from considerations entirely foreign to the right of control. This, we take it, is the view expressed in Courtinard v. Gray Burial and Cremation Company, supra (98 N.J.L. 493), wherein Mr. Justice Minturn said at page 496:
"The flight of time has served to firmly imbed this doctrine in our jurisprudence. Fundamentally, as we have demonstrated in subsequent cases, the theory of master and servant, like that of principal and agent, is based upon the legal conception of representation in a chosen and accepted line of service, by which the employee practically becomes, for that particular duty, the alter ego of the master. It becomes manifest, therefore, that the vicarious responsibility of a third party for injury resulting from the negligent act of another can be legally or logically supported upon no other recognized conception."
Consistent with this thesis is the refusal in Shuster v. McDermit, 104 N.J.L. 58 (E. & A. 1928) to charge a deputy fire chief with the negligence of his subordinate driver. Although a right to control undoubtedly existed in the deputy, yet the driver was not employed by the deputy to further the deputy's interests.
The right of control as to the manner of doing the work is of significance in those situations in which the issue is whether an individual is acting in his own interest as an independent contractor, or is acting as an employee in the interest of the party who engages him. There, that right of control is merely one of the pertinent factors, (see sec. 220 (2) of the Restatement of the Law of Agency), and it assumes a dominant role primarily in those instances in which the work, conditions of work, and mode of payment are substantially consistent with both the relationship of employment and of independent contractor. See, for example, Cappadonna v. Passaic Motor, Inc., 136 N.J.L. 299 (Sup. Ct. 1947), affirmed on opinion below, 137 N.J.L. 661 (E. & A. 1948). But if the relationship of employer-employee is found, the employer is held to account for the negligence of the employee, not because the right of control bears *414 some meaningful connection with the happening of the accident, but rather because the finding of employment brings into play the public policy mentioned above. In short the independent contractor is deemed to be furthering his own interests, whereas the employee is deemed to be furthering the interests of his employer, and on that basis the ultimate responsibility is distributed, in a rough way, among economic entrepreneurs.
But here the question is not whether the engineer was an independent contractor. That he was an employee of someone is conceded. Rather the issue is whether a man, admittedly an employee, was transferred from one employment to another. Such being the issue, it is not clear why it should be resolved by the application of a test designed to aid in a different inquiry. If I am correct in saying that an employer's responsibility for his employee's actions does not depend upon the existence of a causal connection between the accident and the exercise or failure to exercise the right to control, but rather rests upon the stated public policy, then the sole inquiry here pertinent is this: Was the employee's negligence committed while he was acting in furtherance of his general employer's interests? If it was, then the basic public policy which underlies an employer's liability applies with unabated force. It is true that the employee also furthers the interests of the special employer when he performs the service which the general employer contracts to furnish, but that circumstance is common to all transactions whereby one business entity contracts for the services of another business entity, and does not militate against the continued responsibility of the general employer whose interests are likewise served. The result would be otherwise, at least as to third persons, if the general employer merely lent an employee for the sole accommodation of the special employer, to perform services in which the general employer has no business interest whatever.
Hence I conclude that where, as in this case, a general employer furnishes to another his equipment and servant to *415 operate it, the sole issue is whether the servant in doing the act which causes the accident was still furthering the interest of his general employer. On the record, as it now stands, there is no debatable issue of fact. The engineer was clearly furthering Newark Tidewater's interest. He was operating equipment owned by Newark Tidewater in the performance of services which Newark Tidewater agreed to furnish, and Newark Tidewater received compensation both for the use of the equipment and for his services. There is no suggestion that the employee was merely lent to Dade for Dade's sole accommodation and without an economic benefit to Newark Tidewater and hence no evidence to combat the normal inference that the engineer remained on the business of his general employer.
This does not mean that a special employer may not also have some liability in these situations. If a special employer in fact exercises control either over the result to be accomplished or the manner of accomplishing that result and in the exercise of either type of control is guilty of negligence which proximately causes the injury, the special employer would have to respond for his own negligence. Or if the special employer directs the employee to do an act which is beyond the service which the general employer agreed to furnish and the accident resulted from that act, the special employer alone would be chargeable with the legal consequences of that act. But if the causative act was within the service which the general employer agreed to furnish, he is responsible with respect to that act, no matter who directed its performance and without regard to the concurrent liability which may exist on the part of the one who issued the immediate order that the act be done.
The same result would be reached if we applied the test of control over the manner of doing the work. Nothing in the record suggests that Newark Tidewater surrendered its right of control over the engineer with respect to the operation of its equipment, nor in fact that Dade even shared in that right. I prefer, however, to place my conclusions on the *416 ground given above because various considerations lead me to believe that the control test is not only unsound in principle, but is as well unworkable.
Control over the manner in which the work is to be done is claimed to be the significant issue. Yet, in the ordinary case, how can a determination of that issue be removed from the realm of speculation? Usually there is no express covenant relating to the subject of that control. At most there is evidence that the special employer did in fact exercise control of that character. Assuming that the special employer was entitled to exercise such control, yet that proof does not negate the continued existence of the same right in the general employer. That right of control inheres in the general employer by virtue of the conceded fact of employment. Rarely could the proof go beyond showing that the general employer did not exercise his right, but since there ordinarily is no occasion for its exercise, that proof would not establish that the right did not nevertheless continue. Advocates of the control test usually concede that a sharing of that right between the general and special employers is not inconsistent with the continued responsibility of the general employer. Hence, in the common situation, the evidence would permit only speculation as to whether the general employer's right to control continued. In addition, the distinction between control over what work shall be done and how it shall be done, is more easily stated than applied. The distinction between "what" and "how" blurs when detailed orders are given but control of the movements of the equipment still remains in the hands of the assigned employee.
If the requirement of the employee's consent to a transfer is added, the picture is perplexed by still another issue as to which the jury, in the usual case, could only conjecture. Ordinarily, all that appears is that the employee is directed to do certain work under the orders of the special employer. Let us assume that the special employer gives orders with respect to the manner of doing the work and that the employee *417 complies. Such compliance is perfectly consistent with the employee's intention to retain his status as employee of the general employer. An employee who reports to the special employer upon the general employer's orders is probably indifferent as to the nature of the control exercised by the special employer. Surely the employee would not understand that his status would be determined by whether he yields to or rejects an exercise of such control by the special employer. Hence proof of the exercise of that control affords a dubious basis for a reasoned inference that the employee in fact consented to transfer his employment.
And if we should follow the broader suggestion that the jury consider all of the factors, including factors determinative of an employment status, the lack of true guidance would be complete. Let us list just some of the elements: (a) right to hire and discharge; (b) right to replace the employee; (c) ownership of the tools; (d) who pays the employee; (e) method of payment, whether by time or by the job; (f) control over result to be accomplished; (g) control over manner of doing the work; (h) consent of employee to transfer of control; (i) whose business is furthered by the employee's work; (j) whether the work is a part of the regular business of each employer. On this approach, no single factor is decisive. What conclusion does each possible combination of findings indicate? It is hardly enlightening to leave such varied elements to a jury, without an explicit instruction as to consequences attendant upon each combination of facts. We fail to understand how, upon this assortment of elements, the trier of the facts could proceed by a logical process to a conclusion that the employment was or was not transferred. The result in each case, on conceded facts, would be wholly unpredictable. There would be no standard which truly guides the inquiry.
Moreover, apart from the inevitable injustices to the litigants in proceedings between third parties and the employers, the several tests which are here criticized have the further vice of unduly complicating, without perceptible social gain, *418 the rights of the employee, himself. Although it is appreciated that the test of status as between the employee and the general employer need not necessarily be the same as the test controlling in actions between third persons and the employers, yet results reached in the latter situation would probably cast a cloud upon the determination of the compensation claim of the employee, should he be injured. And likewise obscured, and perhaps unjustly defeated, would be the right of the employee to sue the special employer on the basis of the negligence of the latter's servants.
Hence, both on the basis of principle and because of the need for a usable, reasonably definitive rule, it is concluded that the true rule is the one which is here suggested. Some fringe situations will doubtless appear, but they will be fewer than under any of the other suggested tests. In the vast majority of cases, this rule would provide an understandable test which fairly distributes the economic burden of a servant's negligence, consonant with the ultimate basis of the doctrine of respondeat superior.
I do not suggest that all of the decisions of the Court of Errors and Appeals fully support my views, but I do believe that the Younkers case points in that direction. The prior cases seem in the sum total to say that the relation of master and servant must be found between the special employer and the employee on the basis of all factual elements pertinent to a master and servant inquiry and that the right of control flows consequently from the primary finding of the relationship. Certainly all these cases cannot be said to hold, as the majority opinion in the present case appears to conclude, that the element of right of control shall be determined without adverting to the criteria pertinent to the determination of the master and servant relationship. Although the Younkers opinion adverts to all the mentioned factors, yet in its ultimate handling of the case and its final reliance upon the language in the Restatement which I have italicized in the quotation from that opinion (supra) the court appears to have adopted the test which I here advance. It might be *419 added that this test was stated by Judge Cardozo in Charles v. Barrett, 233 N.Y. 127, 135 N.E. 199 (Ct. of Apps. 1922) which was cited with approval in Busch v. Seaboard By-Product Coke Co., supra (100 N.J.L., at p. 307).
The only remaining question which need be considered is whether it was error to submit the issue of contributory negligence to the jury. Although the evidence of contributory negligence on the present record is slim, I think that the circumstances, which need not be narrated, raised a debatable question as to whether plaintiff conducted himself as would a reasonable prudent man so situated.
For the reasons stated, I agree that the judgment should be reversed.