Emory LANE, Plaintiff,

v.

KINGSPORT ARMATURE & ELECTRIC et al., Defendants.

Civ. A. No. 85–0218–B.

United States District Court, D. Virginia, Big Stone Gap Division.

Jan. 4, 1988.

---

Jerry E. Dishner, Gate City, Va., Fay F. Spence, Richard T. McGrath, William M. Sexton, Norfolk, Va., for plaintiff.

M. Lacy West, Kingsport, Tenn., Larry B. Kirksey, Bristol, Va., for Kingsport Armature.

William M. Moffet, Abingdon, Va., for Valley Equipment.

T. Arthur Scott, Jr., Mark S. Dessauer, Kingsport, Tenn., for AFG Industries.

## MEMORANDUM OPINION AND ORDER

GLEN M. WILLIAMS, District Judge.

This case is before the court on the motion of AFG Industries, Inc. (AFG) for summary judgment on plaintiff's second amended complaint. The sole issue in this motion is whether AFG is a statutory employer of the plaintiff, Lane, and thus immune from suit by virtue of the Virginia Workers' Compensation Act, Va.Code 65.-1–1 *et seq.* (1987), or whether AFG is an "other party" under the Act and thereby subject to suit. *See* Va.Code 65.1–41 (1987). The Workers' Compensation Act, "on acceptance of its provisions, denies an injured employee the right to recover damages 'against any other party' unless the latter is one not 'employed in the work' in which the employer of the injured employee is engaged." *Bristow v. Safway Steel Products*, 327 F.2d 608, 609 (4th Cir.1964) (construing earlier version of Act).

## FACTS

AFG is a Delaware corporation with offices in Kingsport, Tennessee. Its primary business is the manufacture of glass. AFG is the sole stockholder of Piedmont Mining Corporation, a Virginia corporation, which AFG purchased on December 11, 1979. AFG thereafter operated Piedmont as a subsidiary of AFG. During and after 1979 Piedmont was in the mining business. It mined and processed dolemite, which it sold to AFG both before and after 1979. Additionally, AFG bought a lime by-product of dolomite in 50 pound bags and resold it to farmers. On April 22, 1983, AFG also bought all the outstanding capital stock of Tri–State Lime Company, a Tennessee corporation that supplied rock to Piedmont. In September of 1983, Tri–State merged with Piedmont.

If the court were to consider AFG's and Lane's affidavits at face value, then the evidence would be in total conflict as to whether AFG "controlled" Piedmont and whether Lane was an actual employee of AFG. The court, however, must discount the conclusionary statements of AFG's witnesses to the effect that Lane became an employee of AFG after the acquisition of Piedmont and that AFG totally "controlled" Piedmont. These statements represent the subjective opinions of the affiants. In Ronald G. McMasters' affidavit and in his response to plaintiff's interrogatories, McMasters states that AFG had day-to-day control of Piedmont's operation, maintained Piedmont's records and payroll, handled Piedmont's hiring and firing, and provided workmen's compensation insurance for Piedmont workers. According to J.A. Chambers's affidavit, Lane was hired by Piedmont on April 2, 1979 and became an employee of AFG in December 1979. Following Lane's injury, AFG reported the injury to its workmen's compensation insurance carrier, American Mutual Insurance Company. Lane received benefits from September 13, 1984 through December 19, 1984, returned to work at Piedmont and worked until January 31, 1985 when Piedmont closed.

Once the court discounts conclusionary testimony, the objective facts tell a different story as to Lane's employment. Lane worked as a maintenance supervisor/mechanic for Piedmont before AFG's purchase. He performed general maintenance, cleaning and helping with the bagging machine where the 50–pound bags of lime were bagged for resale to third parties. Lane was injured on September 12, 1984 while cleaning underneath the scales that weighed the bags. He received a

shock when his arm touched the frame of the conveyor next to the bagging machine. AFG was responsible for a safety program at Piedmont, and conducted inspections twice a year.

AFG and Piedmont were separate corporate entities, Piedmont being a Virginia corporation. AFG is unionized; Piedmont is not. After acquisition, Piedmont continued to have a separate employer identification program, filed its own quarterly and annual employer tax returns and filed its own Virginia Employment Commission (VEC) quarterly report. Although AFG kept accounting records for all its subsidiaries, all wages and salaries were charged to and actually paid by Piedmont, as were all of Piedmont's expenditures. The actual check stub reflecting Lane's pay showed the payment was for Piedmont. Lane was listed as Piedmont's employee on the federal employment tax returns and quarterly VEC returns. The W-3 forms for the Social Security Administration were filed in Piedmont's name and Lane's W-2 form showed Piedmont as his employer. When Piedmont went out of business, Lane lost his job; AFG still remains in business. Piedmont paid the cost of the workmen's compensation for its own employees, including Lane. Although AFG filed a consolidated income tax return for all its subsidiaries as allowed by Internal Revenue Code § 1501, see 26 U.S.C.A. 1501 (1954), the return separately stated the income, deductions and credits of each subsidiary, including Piedmont.

## WAS AFG A STATUTORY EMPLOYER?

In determining whether the parent corporation is a statutory employer for the purposes of the Virginia Workers' Compensation Act, the pertinent question is whether the work Piedmont employees were doing was a part of AFG's normal trade, business or occupation. Cf. Floyd v. Mitchell, 203 Va. 269, 274, 123 S.E.2d 369, 372 (1962) (addressing whether an independent contractor was a statutory employer). Accordingly, for example, cutting and removing trees by one business is not part of the trade or business of manufacturing logs into lumber. Perkinson v. Thomas, 158 Va. 699, 702, 164 S.E. 561, 562 (1932). Construction work is not part of the trade or occupation of manufacturing. Bassett Furniture Industries, Inc. v. McReynolds, 216 Va. 897, 903–04, 224 S.E.2d 323, 327 (1976). Employees of franchised retail gas filling stations are not employees of affiliated oil companies that drill for and process oil for market. Shell Oil Co. v. Leftwich, 212 Va. 715, 724, 187 S.E.2d 162, 168 (1972). Even though the activities of the affiliated companies' employees is necessary or indispensable to the other company's business, this is not the test. After all, that can be said about any interlocking companies. The test is whether the indispensable activity is normally carried on through the parent company's employees rather than by the affiliated company's employees. Id. at 722, 187 S.E.2d at 167. As noted supra, an "other party" is one who is not engaged in the execution or performance of the work of employee's employer. Bristow v. Safway Steel Prods., 327 F.2d 608, 610 (4th Cir.1964).

In a factual situation very similar to the case before the court, plaintiff was working for Pope Construction Company as foreman of an asphalt production plant when he was struck by a heavy construction vehicle operated by an employee of Lambert Brothers who operated a limestone quarry and furnished the limestone that went to Pope's asphalt plant. The asphalt plant was located on leased land at Lambert Brothers' quarry. Simpson v. Lambert Brothers Division–Vulcan Materials Co., 362 F.2d 731, 732 (4th Cir.1966). The court held that providing limestone was not part of Pope's asphalt business, even though the defendant asserted that the two businesses were integrated.

Clearly, Piedmont was not in the business of making glass within the meaning of the Virginia Workers' Compensation Act.

## WAS AFG THE ACTUAL EMPLOYER OF LANE?

Neither party has cited to the court any Virginia authority, nor has the court's re-

search revealed any such authority, regarding when a parent corporation becomes the actual employer of the employees of the subsidiary. Clearly, however, this would happen only when the parent asserts such complete control over the subsidiary that the two corporations become one and the same entity. At least, this is what most courts that have considered the issue seem to say.

In a similar case involving Tennessee's workmen's compensation statute, the court found that a corporation and its wholly owned subsidiary were not so absolutely integrated and commingled that they could not be viewed as a separate economic entity. Despite the fact that the deceased employee had been transferred to the operations of the parent company and payroll checks for both corporations ultimately drew upon the same account, the employee nevertheless remained an employee of the subsidiary, not the parent company. Accordingly, the workmen's compensation statute did not preclude her from suing the parent company. To the court, the most important factors establishing the employee's status were that each corporation hired its own employees, issued its own payroll checks and maintained separate payroll withholding returns. *Latham v. Technar, Inc.*, 390 F.Supp. 1031, 1037–38 (E.D.Tenn.1974).

In similar matters, Michigan appears to have adopted an "economic reality" test where control is a factor, but so is payment of wages, hiring or firing and responsibility for maintaining discipline. However, no single factor is paramount. *Schulte v. American Box Board Co.*, 358 Mich. 21, 33, 99 N.W.2d 367, 372 (1959) (Smith, J., concurring opinion). In *Maki v. Copper Range Co.*, the injured employees of a subsidiary corporation argued on one hand that such a closeness of identity existed between the subsidiary and parent corporation that the parent corporation owed a duty to provide safe working conditions for the subsidiary's employees, and on the other hand that the two corporations were separate entities within the meaning of the immunity provisions of the Workers' Compensation Act. Rejecting that argument, the court stated:

> We agree with the statement in *Pettaway v. McConaghy*, 367 Mich. 651, 654, 116 N.W.2d 789 (1962) that if a corporate veil is pierced because of almost complete identity between the corporation and the majority stockholder, then the majority stockholder and the corporation would generally be considered one and the same, *i.e.*, the employer for purposes of the immunity provisions [of the workmen's compensation statute].

*Maki*, 121 Mich.App. 518, 525, 328 N.W.2d 430, 433 (Mich.Ct.App.1982).

Accordingly, the Tennessee and Michigan courts do not appear far apart. The "economic realities" test is closely related to the "almost complete identity" test, if not synonymous. States having workmen's compensation laws similar to Virginia's appear to agree that subsidiary employees are not employees of the parent under normal parent-subsidiary relationship. *See also Boggs v. Blue Diamond Coal Co.*, 590 F.2d 655, 661–663 (6th Cir.), *cert. denied*, 444 U.S. 836, 100 S.Ct. 71, 62 L.Ed.2d 47 (1979); *Phillips v. Stowe Mills, Inc.*, 5 N.C. App. 150, 154, 167 S.E.2d 817, 820 (N.C.Ct. App.1969), *Thomas v. Hycon, Inc.*, 244 F.Supp. 151, 155 (D.D.C.1965).

Virginia courts are generally protective of the corporate entity. For example, each subsidiary of a parent is a separate employer for unemployment tax rates. *Rogers Jewelry Corp. v. Unemployment Comp. Comm.*, 199 Va. 696, 700, 101 S.E.2d 552, 556 (1958). Accordingly, in this diversity case construing Virginia law, the court should give due deference to the corporate entity. To determine that AFG is the alter ego of Piedmont requires one to find almost total disregard of corporate amenities. Virginia law is well stated in *Beale v. Kappa Alpha Order*, 192 Va. 382, 399, 64 S.E.2d 789, 798: "[c]ourts will disregard the separate legal identities of the corporation only where one is used to defeat public convenience, justify wrongs, protect fraud or crime of the other." That is obviously not the case here.

One may consider what position AFG would take if some third party (non-employee) sued it for a tort solely the responsibility of Piedmont, which occurred before Piedmont went out of business. Would AFG argue that it was responsible for all the wrongs of Piedmont, or would it zealously adhere to the separate nature of the corporate entities? I think that AFG would contend that these were separate corporate beings otherwise, why would Piedmont exist as an entity?

The court hereby denies AFG's motion for summary judgment on plaintiff's second amended complaint.